1

2

3

4

5

6

7                          UNITED STATES DISTRICT COURT

8                     FOR THE EASTERN DISTRICT OF CALIFORNIA

9

10   ALLEN HAMMLER,                              No.  2:15-cv-1645-GEB-EFB P

11                  Plaintiff,

12          v.                                   ORDER AND FINDINGS AND
                                                 RECOMMENDATIONS
13   J. WRIGHT,

14                  Defendant.

15

16          Plaintiff, Allen Hammler, is a state prisoner proceeding pro se and in forma pauperis in an

17   action brought under 42 U.S.C. § 1983.  Defendant J. Wright is a correctional officer.  Plaintiff

18   generally alleges that Wright stole a box of Corn Pops from plaintiff's quarterly package and used

19   excessive force to detain him when he accused Wright of the theft.

20          The following motions are pending: (1) Wright's motion for summary judgment (ECF No.

21   74); (2) Wright's motion to compel (ECF No. 66); (3) plaintiff's motion to exclude (ECF No. 67);

22   (4) plaintiff's second motion to exclude (ECF No. 71); (5) plaintiff's motion to set up phone

23   interviews (ECF No. 70); and (6) plaintiff's motion to have Wright turn over names to court for

24   subpoenas (ECF No. 73).

25          As discussed below, upon careful review of the record, it is recommended that Wright's

26   motion for summary judgment be denied.  Further, it is ordered that: (1) Wright's motion to

27   compel is denied; (2) plaintiff's motion to exclude is denied without prejudice; (3) plaintiff's

28   second motion to exclude is denied without prejudice; (4) plaintiff's motion to set up phone

                                                  1

interviews is denied in part; and (5) plaintiff's motion to have Wright disclose the identities of witnesses is granted in part.

## I.   Background

### A.   Factual Background

Plaintiff is currently incarcerated at California State Prison, Sacramento ("SAC").  At all times relevant to his second amended complaint, he was incarcerated at High Desert State Prison ("HDSP").  ECF No. 65 at 8.

On October 20, 2014, there was a quarterly package distribution in the building in which plaintiff was housed.  ECF No. 74-5 ¶ 2; Dep. at 13–14.[1]  Wright, a correctional officer at HDSP, was distributing the packages.  ECF No. 74-5 ¶¶ 1–2.  At this time, some of the inmates in the building were outside of their cells, including those waiting for their packages.  *Id.* ¶ 4; Dep. at 14, 17.  Plaintiff walked up to the table and Wright put items from the packages in his bag.  ECF No. 74-5 ¶ 2; Dep. at 18.  Wright handed him an invoice and plaintiff signed it.  ECF No. 74-5 ¶ 2; Dep. at 50.  Wright contends that the invoice served to confirm that plaintiff received all the items in the package.  ECF No. 74-3 at 2.

Plaintiff left the table.  Shortly thereafter, he formed the belief that Wright failed to give him a bag of Corn Pops that the invoice listed and that the package allegedly included.  Dep. at 18–19; ECF No. 80 at 16.

Minutes later, plaintiff reapproached the table and accused Wright of stealing the Corn Pops.  ECF No. 74-5 ¶ 3; ECF No. 80 at 16; Dep. at 22.  They had a verbal exchange.  ECF No. 74-5 ¶ 3; ECF No. 80 at 16–17; Dep. at 22.  According to Wright, he told plaintiff that he watched him put all of the items in his bag and that "there was nothing else to give him."  ECF No. 74-5 ¶ 3.  By contrast, plaintiff states that Wright told him that he did not have anything coming.  ECF No. 80 at 16; Dep. at 22–23.

Wright ordered plaintiff to return to his cell.  ECF No. 74-5 ¶ 3.  Plaintiff states that Wright's voice was loud and aggressive when he gave this order.  ECF No. 80 at 17.

---

[1] Wright lodged a hard copy of plaintiff's deposition transcript.  ECF No. 75.

Wright states that he had important reasons to order plaintiff back to his cell. ECF No. 74-5 ¶ 4. First, he states that inmates were required to return to their cells after receiving their packages. *Id.* Second, he states that he had to finish the package distribution in the allotted time to ensure that all of the inmates received their packages. *Id.* Third, he states that other inmates were outside their cells and plaintiff's combative behavior created the risk of them joining the altercation. *Id.*

Plaintiff refused to return to his cell and sat down on a nearby bench. ECF No. 74-5 ¶ 3; ECF No. 80 at 17; Dep. at 23. He states that he calmly told Wright that he was not going to leave until he either could speak with Wright's sergeant or have his Corn Pops. ECF No. 80 at 17; Dep. at 23. By contrast, Wright states that he "demanded" to speak to the sergeant. ECF No. 74-3 at 2; *see* ECF No. 74-5 ¶ 5. Wright walked over to the bench. ECF No. 74-5 ¶ 5; ECF No. 80 at 17.

The parties' stories diverge at this point. According to plaintiff,

> [Wright] . . . walked up on him and [bent] down to face level [and] began yelling in [his] face random threats, e.g., "I'm gonna tear your house (cell) up . . . . [Plaintiff then] placed both [of] his hands in the air over his head and held them there as Wright yelled in his face, spitting on him and in his face as he yelled, "Take it the fuck home!" . . . "Are you done?[]" [p]laintiff asked calmly, his hands still up robbery style. "Now call your sergeant or do what you gotta do," i.e., place [him] in cuffs and escort him to the program office as is the procedure when a prisoner refuses to return to, or lock up[,] in their cell. "Either way," plaintiff advised[,] "I'll get to see the sergeant . . . .

> It was at that time that [Wright] became further agitated, grabbed plaintiff up from the bench and threw him to the ground. Plaintiff never once resisted[] and[,] . . . prior to being grabbed from the bench[,] offered to allow Wright to cuff him, i.e., plaintiff asked [Wright] to take him to the program office. . . . [Plaintiff was] forcefully taken to the ground/concrete hard . . . from a passive, sitting position[,] . . . hands . . . raised to show he was no threat.

> Once on the ground[,] Wright placed his knee in plaintiff's back, all of his weight (estimated 200 lbs.) behind it and another officer . . . placed his knee in plaintiff's neck (estimated 250 lbs.) causing him . . . to have to at times hold his breath, being unable to get air, [due to] the pressure upon his own 140 pound frame [that prevented] him from expanding his stomach. . . . [I]t was obvious plaintiff was not resisting at that time . . . and . . . at no time ever resisted.

> However, . . . [Wright] was rocking his knee in plaintiff's back, his full weight being brought to bear[,] intentionally attempting to get plaintiff to squirm [so] that

3

he could say [that] plaintiff was resisting to allow him . . . to continue applying pressure wantonly to punish plaintiff for his verbally challenging [his and other officers'] process of illegally taking items from prisoners during their issuing of packages. But, plaintiff did not squirm. He told [Wright] that he could not breath[e]. [Wright] responded[,] "You should have thought about that," and continued to pounce on plaintiff, who just stayed as still as he could and held his breath, [whenever] he could take in air, all the time fearful that he was going to lose consciousness. . . .

ECF No. 80 at 17–20; *see also* Dep. at 26–28, 32–34.

Plaintiff has submitted the declaration of inmate Douglass Haugabook to support his version of the altercation. He states:

[Plaintiff] was sitting down on the bench when [Wright] walked up to him and told him to "lock up." At this time[,] [plaintiff] had his hands in the air over his head and was sitting down when [Wright] grabbed him and th[r]ew him to the floor. I saw the whole thing and [plaintiff] was not trying to stop [Wright].

ECF No. 80 at 23.

Wright, for his part, describes the altercation somewhat differently. He states:

When I was about 3-4 feet away, [plaintiff] stood up from the bench and stated "I want you to put me back in my fucking cell," then took a step towards me, making a stance as if he was preparing to fight. At that time I felt that [plaintiff] posed a direct and immediate threat to my physical safety. I yelled "get down," and all inmates in the building got down on the ground except for [plaintiff]. I then shoved inmate [plaintiff] in the right shoulder so that he was turned around with his back to me but [plaintiff] was beginning to turn back around to face me, so I placed my left hand on his left shoulder, and with my right hand between his shoulder blades, I forced [plaintiff] to the ground onto his stomach. I placed my left knee over his left shoulder blade and grabbed his left wrist, then ordered [plaintiff] to put his right hand behind his back so that I could place handcuffs on him, and he complied. I was able to handcuff [plaintiff] quickly, therefore no further force was necessary. Other officers immediately arrived, secured [plaintiff], and I left the building.

[Wright] did not place [his] knee in [plaintiff's] back or lift him up from the bench in order to force him to the ground because [plaintiff] was already standing. . . . Once he was on the ground, [plaintiff] never stated that he could not breath[e] or that he was in pain.

ECF No. 74-5 ¶ 6.

Thereafter, plaintiff was taken to the program office and evaluated for injury. Dep. at 39.

/////

4

The staff who examined him did not document any physical injury.  *Id.* at 41.  Likewise, Wright states that he did not witness any physical injury to plaintiff and that plaintiff did not inform him that he was injured, in pain, or needed medical attention.  ECF No. 74-5 ¶ 9.

For his part, plaintiff states that he had a small cut on his ankle from the leg irons that officers placed on him after the altercation.  Dep. at 39–44.  He further states that his "neck was stiff" and he "was complaining about neck pains."  ECF No. 80 at 15; Dep. at 40.  Additionally, he states that he suffered "anxiety" and was "psychologically troubled in dealing with almost being suffocated to death."  Dep. at 44; ECF No. 80 at 15.  Although plaintiff states that he was given medication for his anxiety and "mental and emotional trauma," he largely declined to discuss his alleged mental health problems during his deposition.  Dep. at 45–46.

### B.    Procedural Background

Plaintiff filed this case in August 2015.  ECF No. 1.  He filed an amended complaint in November 2015.  ECF No. 14.  Subsequently, Wright moved for summary judgment on failure-to-exhaust and *Heck*-bar grounds.  ECF No. 17.  The court denied Wright's motion for summary judgment.  ECF Nos. 36, 40.

In December 2016, plaintiff filed a second amended complaint.  ECF No. 56.  Wright answered.  ECF No. 64.

On March 3, 2017, Wright filed a motion to compel.  ECF No. 66.  Therein, he asserts that plaintiff failed to respond to the first set of his request for production of documents.  ECF No. 66-1 at 1.  Initially, plaintiff failed to respond to the motion to compel.  ECF No. 69 at 1.  Thus, on April 6, 2017, the court ordered him to respond to the motion within twenty-one days.  *Id.* at 2.

On May 3, 2017, after the new deadline had passed, plaintiff filed an opposition to the motion to compel, to which he attached his response to Wright's request for production of documents.  ECF No. 72.  Plaintiff states in his opposition that Wright moved to compel in bad faith because Wright's counsel knew at the time that plaintiff was in a mental health facility and lacked access to a law library and copy machine.  *Id.* at 1–2.  In reply, Wright argues that plaintiff was served with the request in both 2015 and 2016, before he was allegedly in a facility that lacked law library access.  ECF No. 76 at 2.  Furthermore, Wright states that plaintiff was not in a

facility that lacked law library access after he moved to compel in March 2017. *Id.* at 3.
Therefore, Wright seeks sanctions in the amount of $1,015, the alleged expenses his counsel
incurred in bringing the motion to compel. *Id.* at 3–4.

On March 6, 2017, plaintiff filed a motion to exclude. ECF No. 67. He seeks to preclude
Wright from entering his "commitment offense" at trial. *Id.* at 2.

On May 2, 2017, plaintiff filed his motion to set up phone interviews ("motion for
interviews"). ECF No. 70. Therein, he asks the court to order defense counsel to arrange
telephonic interviews between him and inmates Roy Williams and Ester Burnett. *Id.* at 1. To
support this request, he states that Williams witnessed the incident. *Id.* at 2. Further, he states
that Burnett was legally assisting another inmate whose name plaintiff does not know around the
time of the incident. *Id.* Therefore, he concludes, Burnett is likely to know his name. *Id.*

Plaintiff previously made at least two such requests. ECF No. 65 at 6. The court denied
them, reasoning that he failed to show that he had "avail[ed] himself of the process . . . in
California Code of Regulations, Title 15, § 3139, by which an inmate can correspond with
another inmate who is housed at another unit." *Id.* Yet, in his motion for witness interviews, he
states that he followed § 3139's procedures by submitting CDCR 1074 forms, but that prison
officials denied his requests for correspondence. ECF No. 70 at 2. He submitted the forms to
prove this assertion. *Id.* at 5–6.

Wright's counsel filed a declaration in response to the motion for interviews. ECF No.
77. Therein, counsel states that the litigation coordinator at SAC explained that California law
prohibits plaintiff's request to speak to the potential witnesses. *Id.* ¶ 4 (citing Cal. Code Regs. tit.
15, § 3139(f)). Further, counsel states that the litigation coordinator told him that a request that
satisfies § 3139(f) "would only authorize an inmate to correspond in writing with another
inmate," not to "speak to an inmate at another institution over the phone." *Id.* Therefore,
counsel urges the court to deny the motion for interviews. *Id.* ¶ 6. Counsel adds that plaintiff
"will have the opportunity to file a motion and request the attendance of incarcerated witnesses if
this case proceeds to trial." *Id.*

/////

Plaintiff also filed a second motion to exclude evidence.  ECF No. 71.  The basis for this motion is the same as the first motion to exclude.  On the same date, plaintiff filed a motion for subpoenas.  ECF No. 73.  He asks that Wright provide the court with the names and CDCR numbers of the five African American inmates who were serving on the yard crew the day of the incident so that the court can issue subpoenas to secure their appearances at trial.  *Id.*  In opposition, defense counsel asserts that the five inmates have been identified by counsel.  ECF No. 78, ¶ 2.  However, defense counsel only shared with plaintiff information regarding one of the inmates because the other four did "not consent [to] the disclosure of any of their information to Plaintiff[, ] are unwilling to participate in this case[, and informed her] that they did not witness the incident in question."  *Id.* ¶ 4.  Defense counsel proposes that, "if the Court finds it appropriate, Defendant will disclose the names of [the] remaining four inmates to the Court, *in camera*, for the Court to determine if their attendance as witnesses is appropriate if and when this case [is] set for trial."  *Id.* ¶ 5.

On May 5, 2017, Wright moved for summary judgment.  ECF No. 74.  Wright argues that plaintiff's excessive force claim fails for the following reasons:

- The evidence shows that plaintiff received the Corn Pops.  ECF No. 74-2 at 5.
- "Plaintiff refused multiple orders to return to his cell and admitted that he would have continued to refuse those orders unless his demands were met, despite the fact that he was aware that he had other avenues through which he could have had his concerns addressed."  *Id.*
- Plaintiff interrupted package distribution in the presence of other inmates.  His "open defiance could have easily led to a riot [and] . . . , therefore[,] it was necessary for . . . Wright to act immediately . . . to de-escalate the situation."  *Id.*
- Wright had to take plaintiff to the ground because he "took a stance as if he was preparing to fight."  *Id.* at 7.
- Wright "brought plaintiff to the ground in one motion and only restrained [him] on the ground until he was able to place the handcuffs on him, which was quick because, once on the ground, [p]laintiff complied with . . . Wright's orders and

7

submitted to the handcuffs." *Id.* at 9.

- Plaintiff's assertion that Wright pushed his knee into his back and forced him to squirm, thus making it hard for him to breathe, lacks credibility. "Curiously, [p]laintiff did not make this allegation in his original complaint or in his 602 appeals, but inserted these facts for the first time in his [s]econd [a]mended [c]omplaint, which was filed more than two years after the incident occurred." *Id.* at 10. "It is difficult to believe that such a traumatizing occurrence . . . would be completely omitted from all of [p]laintiff's prior statements about the incident." *Id.* "Tellingly, [p]laintiff admitted in his deposition . . . that he only included these facts after reading about a lawsuit in which the [p]laintiff in that case made similar allegations." *Id.*

- "Plaintiff suffered no physical injury, let alone the 'serious' bodily injury indicative of excessive force." *Id.* at 9.

Additionally, Wright argues that he is entitled to qualified immunity because he "acted reasonably and complied with protocol." *Id.* at 10. To support this argument, he states that "a reasonable official in [his] position would not know that using a minimal amount of force to gain compliance with an order when faced with an imminent threat of harm to himself, the inmate, staff, and other inmates in that setting, was unlawful." *Id.* at 11.

Plaintiff has opposed Wright's motion for summary judgment. ECF No. 80. Generally, he argues that Wright's force was excessive because he was passively seated with his hands in the air when Wright allegedly threw him to the ground and forcefully kneeled on his back to the point that he could barely breathe. *Id.* at 3–4. Further, plaintiff argues that some of the remarks that Wright made during the altercation indicate that his actions were malicious and sadistic. *See id.* at 7. Finally, he asserts that Wright does not enjoy qualified immunity because "no reasonable officer would have believed that using force on a passively seated prison with his hands up in placation was lawful." *Id.* at 11.

Wright's reply is similar in substance to his motion for summary judgment. Yet he contends that additional evidence casts doubt on the credibility of plaintiff's assertion that "he

could not breathe when . . . restrained . . . on the floor." ECF No. 81, at 4. Likewise, he notes that inmate Haugabook's declaration "makes no mention of any use of force on [p]laintiff other than [him] being taken to the floor, which is not in dispute." *Id.*

## II. Standard of Review

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment avoids unnecessary trials in cases in which the parties do not dispute the facts relevant to the determination of the issues in the case, or in which there is insufficient evidence for a jury to determine those facts in favor of the nonmovant. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–50 (1986); *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471–72 (9th Cir. 1994). At bottom, a summary judgment motion asks whether the evidence presents a sufficient disagreement to require submission to a jury.

The principal purpose of Rule 56 is to isolate and dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Thus, the rule functions to "'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments). Procedurally, under summary judgment practice, the moving party bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323; *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). If the moving party meets its burden with a properly supported motion, the burden then shifts to the opposing party to present specific facts that show there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 248; *Auvil v. CBS "60 Minutes"*, 67 F.3d 816, 819 (9th Cir. 1995) (per curiam).

A clear focus on where the burden of proof lies as to the factual issue in question is crucial to summary judgment procedures. Depending on which party bears that burden, the party seeking summary judgment does not necessarily need to submit any evidence of its own. When the

opposing party would have the burden of proof on a dispositive issue at trial, the moving party need not produce evidence which negates the opponent's claim. *See, e.g.*, *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 885 (1990). Rather, the moving party need only point to matters which demonstrate the absence of a genuine material factual issue. *See Celotex*, 477 U.S. at 324 (citation omitted) ("[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file."). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See id*. at 322. In such a circumstance, summary judgment must be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in [Rule 56(a)], is satisfied." *Id.* at 323.

To defeat summary judgment the opposing party must establish a genuine dispute as to a material issue of fact. This entails two requirements. First, the dispute must be over a fact(s) that is material, i.e., one that makes a difference in the outcome of the case. *Anderson*, 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."). Whether a factual dispute is material is determined by the substantive law applicable for the claim in question. *Id.* If the opposing party is unable to produce evidence sufficient to establish a required element of its claim that party fails in opposing summary judgment. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

Second, the dispute must be genuine. In determining whether a factual dispute is genuine the court must again focus on which party bears the burden of proof on the factual issue in question. Where the party opposing summary judgment would bear the burden of proof at trial on the factual issue in dispute, that party must produce evidence sufficient to support its factual claim. Conclusory allegations unsupported by evidence are insufficient to defeat the motion.

*Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  Rather, the opposing party must, by affidavit or as otherwise provided by Rule 56, designate specific facts that show there is a genuine issue for trial.  *Anderson*, 477 U.S. at 248; *Devereaux*, 263 F.3d at 1076 (citations omitted).  More significantly, to demonstrate a genuine factual dispute the evidence relied on by the opposing party must be such that a reasonable jury "could return a verdict for [him] on the evidence presented."  *Anderson*, 477 U.S. at 248, 252.  Absent any such evidence there simply is no reason for trial.

The court does not determine witness credibility.  It believes the opposing party's evidence and draws inferences most favorably for the opposing party.  *See id.* at 249, 255; *Matsushita*, 475 U.S. at 587.  Inferences, however, are not drawn out of "thin air," and the proponent must adduce evidence of a factual predicate from which to draw inferences.  *Am. Int'l Grp., Inc. v. Am. Int'l Bank*, 926 F.2d 829, 837 (9th Cir. 1991) (Kozinski, J., dissenting) (citing *Celotex*, 477 U.S. at 322).  If reasonable minds could differ on material facts at issue, summary judgment is inappropriate.  *See Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).  On the other hand, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587 (citation omitted).  In that case, the court must grant summary judgment.

**III.    Analysis**

**A.    Motion for Summary Judgment**

**1.    Discussion—Excessive Force**

"When prison officials use excessive force against prisoners, they violate the inmates' Eighth Amendment right to be free from cruel and unusual punishment."  *Clement v. Gomez*, 298 F.3d 898, 903 (9th Cir. 2002).  To establish a claim for excessive force based on a prison official's use of force during a prison disturbance, the plaintiff must show that the officer applied the force maliciously and sadistically to cause harm rather than in a good-faith effort to maintain or restore discipline.  *Hudson v. McMillian*, 503 U.S. 1, 6 (1992).  Courts consider the following

11

nonexhaustive list of factors to determine whether a prison official's use of force during a prison disturbance is malicious and sadistic: "[1] the need for application of force, [2] the relationship between that need and the amount of force used, [3] the threat reasonably perceived by the responsible officials, and [4] any efforts made to temper the severity of a forceful response." *Id.* at 7 (citation omitted). Further, courts may consider "the extent of injury suffered by [the] inmate." *Id.*

Here, believing plaintiff's evidence and construing it favorably, a reasonable jury could find that Wright maliciously and sadistically used force to harm him. Regarding factor one, plaintiff, as a percipient witness, states that he was seated passively with his hands up when Wright grabbed him from the bench and forcefully threw him to the concrete floor. Furthermore, Wright concedes that he did not resist detention once on the ground. ECF No. 74-2 at 9. Thus, while the facts are disputed, if a jury credits plaintiff's testimony, he posed no imminent security threat and did not resist detention. At best, then, Wright needed to use only minimal force to detain him. Consequently, factor one strongly favors him.

For similar reasons, factor two strongly favors plaintiff. Because there was, at best, a minimal need for force, Wright's snatching plaintiff from the bench and throwing him to the floor was a disproportionate response. Likewise, because plaintiff did not resist once on the ground, kneeling down on him such that he struggled to breathe was a disproportionate response. Thus, on plaintiff's version of the facts, the magnitude of Wright's force was grossly disproportionate to its need.

Factor three, likewise, favors plaintiff. Although he initially disrupted the package distribution and acted defiantly, he states that he had taken a seat and put his hands up before Wright allegedly lifted him off the bench and threw him down. Wright notes that plaintiff said "do what you gotta do" when he was sitting down. ECF No. 81 at 2. This fact, he believes, shows that plaintiff was still belligerent at that time. However, plaintiff states that he calmly said "Now call your sergeant or do what you gotta do." ECF No. 80 at 18. This statement, in his words, meant to "place [him] in cuffs and escort him to the program office" so that he could see the sergeant about his allegation of theft. *See id.* Therefore, drawing all reasonable inferences in

his favor, he did not pose a security threat when Wright detained him. Thus, on his version of the facts, it was unreasonable for Wright to perceive his actions as threatening. Again, it will be for the trier of fact to resolve the credibility of the conflicting witnesses. That cannot be determined on summary judgment.

Factor four also favors plaintiff. While it is undisputed that he refused to return to his cell, his evidence does not indicate that Wright tried to temper his use of force. For instance, there is no indication that Wright warned plaintiff that he was going to take him down if he did not return to his cell. Nor is there any indication that Wright used less forceful measures (e.g., standing plaintiff up from the bench and handcuffing him in that position). Rather, plaintiff states that, after he said "Now call your sergeant or do what you gotta do," Wright grabbed him and threw him down in one "sequence" or "swoop." Dep. at 28, 33. Wright suggests that his taking plaintiff down in one swoop shows that he did not use excessive force. *See* ECF No. 74-3 at 3. However, coupled with plaintiff's other evidence, a jury could reasonably infer from this action that Wright's takedown was violent. Accordingly, factor four favors plaintiff.

Yet the last factor, the extent of the injury, strongly favors Wright. Granted, plaintiff states that his neck was stiff and in pain after the incident. However, this assertion is vague and he has not submitted any medical evidence to substantiate his alleged neck injury. He also states that the incident caused him anxiety and unspecified mental health problems that required medication. But he did not submit evidence to substantiate these injuries and, in fact, refused to discuss them in reasonable detail during his deposition. True, he states that he had a small cut on his ankle from the leg irons that officers placed on him after the altercation. However, this alleged injury did not result from the actions in controversy (i.e., taking him down and kneeling on him). Accordingly, the fifth factor weighs in favor of a finding that Wright's force was not excessive.

But the fact that the fifth factor weighs heavily in Wright's favor does not dispose of plaintiff's excessive force claim. "An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." *Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010) (per curiam). Rather, the

"[t]he 'core judicial inquiry,' . . . [is] . . . 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Id.* at 34 (quoting *Hudson*, 503 U.S. at 7). No one of the *Hudson* factors is dispositive, *see* 503 U.S. at 7, and the other four factors counsel firmly in favor of a finding that Wright's force was excessive. Moreover, plaintiff states that Wright screamed at him, spit in his face, and made antagonizing remarks right before throwing him to the concrete floor and pressing his weight down on him. These factual assertions, coupled with plaintiff's other evidence, support a reasonable finding that malice and sadism motivated Wright's actions, not a good-faith effort to restore discipline. *See Johnson v. Blaukat*, 453 F.3d 1108, 1113 (8th Cir. 2006) (summary judgment to guard improper where "[t]he factors outlined in *Hudson* . . . could be weighed by a trier of fact in favor of [the plaintiff] or the officers, and a jury could find that force was applied to [the plaintiff] maliciously and sadistically").

Wright's counterarguments lack merit. Wright argues that he had to take plaintiff down to restore order and prevent the conflict from spreading to the inmates who were outside their cells. The court agrees that Wright was entitled to use some force to subdue plaintiff because he refused to return to his cell. Further, the court agrees that obviating a larger altercation was a legitimate penological objective. *See Hudson*, 503 U.S. at 6 (ellipsis in original) (citation omitted) ("[Prison] administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."). However, the issue is whether Wright's force was excessive. Believing plaintiff's evidence and construing it favorably, a reasonable jury could so find.

Furthermore, Wright contends that plaintiff was standing up and taking a fighting stance, which he believes necessitated his actions all the more. He adds that he used only minimal force to subdue plaintiff because he took him to the ground in one motion and only briefly restrained him once there. But these arguments take Wright's version of the facts for granted and are dependent on a finding that plaintiff's testimony is not believable. On summary judgment, however, plaintiff's evidence "is to be believed." *Anderson*, 477 U.S. at 255. To reiterate,

14

plaintiff states that he was seated with his hands up when Wright grabbed him from the bench and threw him to the floor. He also states that, even though he was compliant, Wright kneeled on him so hard that he could barely breathe. The jury must resolve these genuine factual disputes.

Additionally, Wright argues that plaintiff's assertion that he kneeled on him hard enough to restrict his breathing lacks credibility. But evaluating the credibility of plaintiff's factual assertions is "a jury function[.]" *Id*. Moreover, the basis for this argument is that plaintiff did not make this assertion until late in the litigation even though he had prior opportunities to do so (e.g., prior complaints). This omission, Wright argues, proves that the statement lacks credibility. But the fact that plaintiff did not initially reveal every factual allegation supporting his claim does not compel the conclusion that subsequent factual allegations supporting the claim are untrue. Wright counters that plaintiff admitted at his deposition that he did not add the allegations until he read about lawsuits in which the plaintiff made similar allegations. However, Wright misreads plaintiff's deposition testimony. Construing his evidence favorably, a better reading of the relevant testimony is that: (1) Wright forcefully kneeled on him and made it hard for him to breathe; (2) plaintiff did not think that he had to plead this fact to state a claim; and (3) he had a better recollection of the event later. *See* Dep. at 85–88. In any event, credibility determinations are jury functions.[2]

For these reasons, a reasonable jury could find that Wright maliciously and sadistically used force on plaintiff to harm him. Accordingly, Wright's motion for summary judgment should be denied.

## 2. Qualified Immunity

Wright argues that qualified immunity shields him from plaintiff's excessive force claim. He is mistaken.

Qualified immunity protects government officials from liability for civil damages where a reasonable official would not have known that his conduct violated a clearly established right. *Anderson v. Creighton*, 483 U.S. 635, 638–39 (1987). In resolving questions of qualified

---

[2] Wright also contends that the evidence shows that plaintiff received the Corn Pops. Whether plaintiff actually received the Corn Pops, however, is largely immaterial to the analysis.

immunity, "courts engage in a two-pronged inquiry." *Tolan v. Cotton*, 134 S. Ct. 1861, 1865 (2014) (per curiam). "The first asks whether the facts, taken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a federal right." *Id.* (citation and bracketing omitted). "The second prong . . . asks whether the right in question was clearly established at the time of the violation." *Id.* at 1866 (citation omitted).

A right is "clearly established" when "the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640. Clearly established law should not be defined "at a high level of generality"; rather, it "must be particularized to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam) (citation omitted). While this standard does not require "a case directly on point," *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011), courts typically should identify analogous cases, i.e., ones in which prison officials "acting under similar circumstances" violated the Eighth Amendment, *White*, 137 S. Ct. at 552. To be analogous, however, the case need not be "materially similar."[3]

In the Ninth Circuit, to assess whether a right is clearly established, courts first look to "Supreme Court and Ninth Circuit law existing at the time of the alleged act." *Cmty. House, Inc. v. City of Boise*, 623 F.3d 945, 967 (9th Cir. 2010) (citation omitted). Absent binding precedent, courts should consider all relevant decisional law. *Capoeman v. Reed*, 754 F.2d 1512, 1514 (9th Cir. 1985). Unpublished circuit and district court decisions inform the analysis. *Bahrampour v. Lampert*, 356 F.3d 969, 977 (9th Cir. 2004); *Krug v. Lutz*, 329 F.3d 692, 699 (9th Cir. 2003).

The Supreme Court has established that, to quell a prison disturbance, a correctional officer may not use force maliciously and sadistically to cause harm. *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986) (citation omitted); *Hudson*, 503 U.S. at 6; *Jeffers v. Gomez*, 267 F.3d 895, 910 (9th Cir. 2001) (per curiam) (citations omitted) ("The Eighth Amendment protections

---

[3] *Hope v. Pelzer*, 536 U.S. 730, 739 (2002); *see also Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam) (stating that, "in an obvious case," general legal standards may clearly establish law "without a body of relevant cases" (citing *Hope*, 536 U.S. at 738)); *Giebel v. Sylvester*, 244 F.3d 1182, 1189 (9th Cir. 2001) (citation omitted) ("[E]ven if there is no closely analogous case law, a right can be clearly established on the basis of common sense.").

afforded inmates during violent prison disturbances have been delineated by the Supreme Court on numerous occasions."). Likewise, the Ninth Circuit has established that "force is only justified when there is a need for force." *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 (9th Cir. 2007). Thus, "officers [usually may not] use excessive force on an arrestee after he or she has surrendered, or is otherwise helpless . . . ." *Barnard v. Las Vegas Metro. Police Dep't*, 310 F. App'x 990, 992 (9th Cir. 2009) (unpublished memorandum) (citing *LaLonde v. County of Riverside*, 204 F.3d 947, 961 (9th Cir. 2000)).

Consistent with these principles, the Ninth Circuit has established that violently tackling or taking down a compliant plaintiff in a manner that poses a risk of harm constitutes excessive force. *Blankenhorn*, 485 F.3d at 478, 481 (reasonable juror could conclude that officers' force was unreasonable where they gang tackled relatively calm trespass suspect who did not actively resist arrest).[4] The Ninth Circuit has also established that officers use excessive force when they press their weight down on compliant plaintiffs and restrict their breathing, thus subjecting them a risk of suffocation. *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1061 (9th Cir. 2003) (reasonable officers would have known that crushing passive, prone plaintiff "against the ground by pressing their weight on his neck and torso [] and continuing to do so despite his repeated cries for air" constituted excessive force); *cf. Barlow v. Ground*, 943 F.2d 1132, 1135– 36 (9th Cir. 1991) (reasonable juror could find that tackling an arrestee from behind and applying

---

[4] *See also Meredith v. Erath*, 342 F.3d 1057, 1061 (9th Cir. 2003) (reasonable jury could find that federal agent used excessive force against suspect who only passively resisted arrest where, *inter alia*, he grabbed her by her arms and threw her to the ground); *Santos v. Gates*, 287 F.3d 846, 853–54 (9th Cir. 2002) (reasonable jury could find officers' force excessive where they threw suspect to the ground and broke his back after he dropped to his knees with his hands behind his head); *Josfan v. Indochine*, No. 09–cv–07904, 2012 WL 113371, at *9 (C.D. Cal. Jan. 13, 2012) (reasonable jury could find that officers used excessive force when they "physically grabbed plaintiff, forced him to the ground, and handcuffed him" and plaintiff testified that he was not resisting); *Woodward v. City of Menlo Park*, No. C 09–3331 SBA, 2011 WL 810702, at *6 (N.D. Cal. Mar. 2, 2011) (reasonable jury could find that officer's force was unreasonable where, *inter alia*, officer tackled plaintiff after he "raised his hands and surrendered"); *Newman v. San Joaquin Delta Cmty. Coll. Dist.*, No. 09–cv–0344, 2010 WL 2179964, at *4 (E.D. Cal. May 27, 2010) (most alterations in original) (citations omitted) ("Taking [the] allegations as true, [the officer] used unreasonable force against [plaintiff] by dragging him to the ground and pinning him there because [he] posed no danger to the officers, [and] did nothing to provoke them . . . .").

17

an "extremely punishing pain compliance hold" to his back for accidentally knocking down protestor's sign was excessive).

Here, taking the facts in the light most favorable to plaintiff, Wright maliciously and sadistically threw him down and kneeled on his back to harm him, not to restore order. Again, plaintiff states that he was calmly seated with his hands up when Wright accosted him, berated him, and violently detained him, which included mocking his cries for air. *See supra* at 3–4. And, as the preceding cases show, Wright's alleged forceful tackling of plaintiff and heavily kneeling on him when he was passive and prone is unreasonable conduct. Indeed, Wright acknowledges that, "[h]ad [plaintiff] remained seated on the bench when [he] approached him, . . . [he] would have simply handcuffed [him] while he was seated." ECF No. 74-5 ¶ 7.

Wright argues that "a reasonable official in [his] position would not know that using a minimal amount of force to gain compliance with an order when faced with an imminent threat of harm to himself, the inmate, staff, and other inmates in that setting, was unlawful." ECF No. 74 at 11. Again, however, this argument takes Wright's version of the facts for granted. In resolving questions of qualified immunity on summary judgment, the court must take the facts "in the light most favorable to the party asserting the injury[.]" *Tolan*, 134 S. Ct. at 1865. Accordingly, Wright does not enjoy qualified immunity.

### B. Motion to Compel

Wright's motion to compel is denied. The record reflects that, albeit tardily, plaintiff gave Wright the documents that he sought. The court also denies Wright's request to impose sanctions. While plaintiff tardily produced the documents, Wright has not argued, much less shown, that the tardy production prejudiced him. Moreover, plaintiff is an indigent inmate. ECF No. 4. Under these circumstances, ordering him to pay sanctions would not serve the ends of justice. *See* Fed. R. Civ. P. 37(a)(5)(A)(iii). As a result, the court denies Wright's motion to compel.

/////

/////

/////

18

### C. Motion to Exclude

Plaintiff's motion to exclude is, in essence, a motion in limine to preclude Wright from using his conviction as evidence at trial. As this motion is premature, it is denied without prejudice.

### D. Second Motion to Exclude

The court denies, without prejudice, this motion for the same reasons that it denied the first such motion.

### E. Motion for Subpoenas

The requests in plaintiff's motion for subpoenas are granted in part and denied in part. The court will not issue any subpoenas at this time because trial has not been set and plaintiff has yet to substantiate his assertion that the inmates witnessed the altercation. Therefore, at this stage, plaintiff has not shown that it would be appropriate to subpoena for trial any of these inmates.

However, it appears that the names and CDCR numbers of these inmates should have been disclosed to plaintiff during discovery. For that reason, the court reconsiders its March 2, 2017 order denying as moot this portion of plaintiff's motion to compel. *See* ECF No. 65 (deeming plaintiff's request moot in light of defendant's agreement to disclose the identities of the inmates to plaintiff pending their consent to such disclosure). Upon reconsideration, the court is not persuaded that disclosing the identities of these four potential witnesses, absent their consent, would be inappropriate. *See Fields v. Banuelos*, No. 1:09-cv-1868-SKO, 2012 U.S. Dist. LEXIS 97701, at *14-15 (E.D. Cal. July 13, 2012) ("Defendant's assertion that identifying by name the inmates who occupied the two cells next to Plaintiff on the two relevant dates in June 2006 would somehow jeopardize the safety and security of the institution, the inmates, or staff is unsupported by any specific evidence. In as much inmates can and do learn one another's names at every turn during their incarceration, it is simply not a persuasive assertion. If there is additional reason for concern, it has not been presented here."); *Howard v. DeAzevedo*, No. 1:11-0101-AWI-SKO, 2013 U.S. Dist. LEXIS 168365, at *22 (E.D. Cal. Nov. 26, 2013) ("Information regarding eye and ear witnesses is clearly subject to discovery, and Defendant James' objections

19

do not suffice to prevent disclosure.").  As in *Fields* and *Howard* no persuasive reasons has been presented to withhold the identity of the witnesses in question here.  Thus, defendant shall provide plaintiff with the names and CDCR numbers of the four inmates within 14 days of the date of this order.  If and when the court issues a pretrial order, it will detail the procedures by which plaintiff may obtain subpoenas to secure the attendance of any incarcerated witnesses for trial.

### F.    Motion for Interviews

In his motion for interviews, plaintiff asks the court to order defense counsel to arrange telephonic interviews between him and inmates Roy Williams and Ester Burnett.  ECF No. 70 at 1.  Williams allegedly witnessed the incident.  *Id.* at 2.  Burnett allegedly was legally assisting an inmate whose name plaintiff does not know around the time of the incident.  *Id.*  Therefore, plaintiff contends, Burnett is likely to know his name.  *Id.*

The court denies this motion in part with respect to Williams.  California law prohibits inmates from placing "a call to an inmate at any other facility."  Cal. Code Regs. tit. 15, § 3282(c)(7); *see id.* § 3139(f).  Therefore, the court will not authorize plaintiff to call Williams.  However, plaintiff states that Williams witnessed the altercation, and the record reflects that defense counsel has contacted inmates on behalf of plaintiff regarding discovery matters.  Accordingly, the court will direct defense counsel to contact Williams and ask whether he witnessed the incident and is willing to participate in the case.  Further, upon obtaining this information, defense counsel must provide it to the court and plaintiff.

By contrast, the court denies this motion in full with respect to Burnett.  Plaintiff does not state that Burnett witnessed the incident.  Furthermore, the vague and conclusory assertion that Burnett was legally assisting an inmate who allegedly witnessed the incident does not create a reasonable likelihood that Burnett will be able to identify this alleged inmate.  Thus, because its burden greatly outweighs its likely benefit, the court denies this discovery request.  *See* Fed. R. Civ. P. 26(b)(1).

/////

/////

**IV.    Conclusion**

Accordingly, IT IS HEREBY ORDERED that:

1.  Wright's motion to compel (ECF No. 66) is denied;

2.  Plaintiff's motion to exclude (ECF No. 67) is denied without prejudice;

3.  Plaintiff's second motion to exclude (ECF No. 71) is denied without prejudice;

4.  Plaintiff's motion for interviews (ECF No. 70) is denied in part, with the result that defense counsel must contact inmate Williams as specified in this order; and

5.  Plaintiff's motion for subpoenas (ECF No. 73) is granted in part.  As a result, within fourteen days of the entry of this order, Wright must disclose to plaintiff the names and CDCR numbers of the four inmates in question.

Further, it is RECOMMENDED that Wright's motion for summary judgment (ECF No. 74) be denied.

These findings and recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within seven days after service of the objections.  Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).

Dated:  November 28, 2017.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE